**RECORD NO. 12-5223**

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

In The

# United States Court of Appeals

### For The District of Columbia Circuit

# CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,

*Plaintiff – Appellant*,

**v.**

# UNITED STATES DEPARTMENT OF JUSTICE,

*Defendant – Appellee.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

_____

## BRIEF OF APPELLANT

_____

**\*Anne L. Weismann**
**Melanie T. Sloan**
CITIZENS FOR RESPONSIBILITY AND
  ETHICS IN WASHINGTON
**1400 Eye Street, N.W., Suite 450**
**Washington, D.C.  20005**
**(202) 408-5565**

*Counsel for Appellant*

David L. Sobel
LAW OFFICE OF DAVID L. SOBEL
**1818 N Street, N.W., Suite 410**
**Washington, D.C.  20036**
**(202) 246-6180**

*Counsel for Appellant*

**THE LEX GROUP**DC ♦ 1825 K Street, N.W. ♦ Suite 103 ♦ Washington, D.C.  20006
(202) 955-0001 ♦ (800) 856-4419 ♦ Fax: (202) 955-0022 ♦ www.thelexgroup.com

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

**A.  Parties and Amici.**

Plaintiff-appellant is Citizens for Responsibility and Ethics in Washington, a non-profit corporation.  Defendant-appellee is the United States Department of Justice.

There were no amici curiae in district court.

**B.  Rulings Under Review.**

The rulings under review are the order and memorandum opinion of the district court issued on June 23, 2012, *Citizens for Responsibility and Ethics in Washington v. U.S. Department of Justice*, No. 1:11-cv-00592 RJL (D.D.C.) (Judge Richard J. Leon).  The order and opinion appear as items #21 and #22 on the district court docket (D.D.C. No. 11-cv-00592).  The district court's opinion is available at 870 F. Supp. 2d 70 (D.D.C. 2012).

**C.  Related Cases.**

This case has not previously come before this Court.  Counsel is aware of no other related cases pending before this Court or any other court within the meaning of  D.C. Circuit Rule 28(a)(1)(c).

## APPELLANT'S RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Red. R. App. P. 26.1 and D.C. Cir. Rule 26.1, plaintiff-appellant Citizens for Responsibility and Ethics in Washington ("CREW") submits its corporate disclosure statement.

(a) CREW has no parent company, and no publicly-held company has a 10 percent or greater ownership interest in CREW.

(b) CREW is a non-profit, non-partisan corporation organized under section 501(c)(3) of the Internal Revenue Code. Through a combined approach of research, advocacy, public education, and litigation, CREW seeks to protect the rights of citizens to be informed about the activities of government officials and to ensure the integrity of those officials. Among its principle activities, CREW routinely requests information from government agencies under the Freedom of Information Act ("FOIA"), and pursues its rights to information under the FOIA through litigation. CREW then disseminates, through its website and other media, both documents it receives in response to its FOIA requests and written reports based in part on those documents.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iii

GLOSSARY ...................................................................................... viii

STATEMENT OF JURISDICTION ..........................................................1

STATEMENT OF THE ISSUE ................................................................1

STATUTES AND REGULATIONS ..........................................................1

STATEMENT OF THE CASE..................................................................1

STATEMENT OF FACTS ......................................................................3

     I.     FACTUAL BACKGROUND ..................................................3

     II.    PROCEDURAL HISTORY ...................................................6

SUMMARY OF ARGUMENT ...............................................................11

STANDARD OF REVIEW ....................................................................14

ARGUMENT ....................................................................................14

     I.     DOJ'S CATEGORICAL WITHHOLDING OF ALL
          RESPONSIVE DOCUMENTS UNDER FOIA EXEMPTIONS
          6 AND 7(C) TO PREVENT REVELATION OF MR. DELAY'S
          ASSOCIATION WITH A CRIMINAL INVESTIGATION IS
          UNLAWFUL...................................................................14

          A.       DOJ Has Failed To Identify A Cognizable Privacy
                 Interest Of Mr. DeLay That Justifies A Categorical
                 Withholding ...............................................................14

i

B.      Both DOJ And The District Court Improperly
        Discounted The Substantial Public Interest In The
        Requested Records .......................................................22

II.     DOJ'S CATEGORICAL WITHHOLDING OF ALL
        RESPONSIVE DOCUMENTS UNDER FOIA EXEMPTION
        7(A) TO PREVENT INTERFERENCE WITH A CRIMINAL
        INVESTIGATION IS UNLAWFUL....................................................32

III.    DOJ'S CATEGORICAL WITHHOLDING OF RESPONSIVE
        INFORMATION UNDER FOIA EXEMPTIONS 3, 7(D), AND
        7(E) IS UNLAWFUL ..........................................................................38

        A.     Exemption 3 ............................................................39

        B.     Exemption 7(D)........................................................41

        C.     Exemption 7(E) ........................................................45

CONCLUSION ..................................................................................47

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Am. Civil Liberties Union v. U.S. Dep't of Justice,*
  655 F.3d 1 (D.C. Cir. 2011)..............................................................14, 15, 31

*Billington v. U.S. Dep't of Justice,*
  233 F.3d 581 (D.C. Cir. 2000)....................................................................42

*Birch v. U.S. Postal Serv.,*
  803 F.2d 1206 (D.C. Cir. 1986)..................................................................19

*Blackwell v. FBI,*
  646 F.3d 37 (D.C. Cir. 2011)................................................................46, 47

*Campaign for Responsible Transplantation v. FDA,*
  511 F.3d 187 (D.C. Cir. 2007)....................................................................38

*Campbell v. Dep't of Health & Human Servs.,*
  682 F.2d 256 (D.C. Cir. 1982)....................................................................37

*Campbell v. U.S. Dep't of Justice,*
  164 F.3d 20 (D.C. Cir. 1998)......................................................................42

*Common Cause v. Nat'l Archives & Records Admin.,*
  628 F.2d 179 (D.C. Cir. 1980)..............................................................12, 24

*Cong. News Syndicate v. U.S. Dep't of Justice,*
  438 F. Supp. 538 (D.D.C. 1977)..................................................................25

*CREW v. U.S. Dep't of Justice,*
  840 F. Supp. 2d 226 (D.D.C. 2012)......................................................26, 30

*CREW v. U.S. Dep't of Justice,*
  846 F. Supp. 2d 63 (D.D.C. 2012)..............................................................30

*Chief Authorities are Designated with an Asterisk

iii

*CREW v. Dep't of Justice*,
  870 F. Supp. 2d 70 (D.D.C. 2012)............... 10, 11, 18, 20-21, 23, 25, 27, 32,
                                                33, 35, 38, 39, 40, 43, 44

*Davis v. U.S. Dep't of Justice*,
  968 F.2d 1276 (D.C. Cir. 1992)....................................................27

*Dep't of Air Force v. Rose*,
  425 U.S. 352 (1976)...................................................................29

*Dow Jones & Co. v. U.S. Dep't of Justice*,
  724 F. Supp. 985 (D.D.C. 1989), *aff'd in part*, *rev'd in part*,
  917 F.2d 571 (D.C. Cir. 1989)................................................ 24-25

*Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*,
  656 F.2d 856 (D.C. Cir. 1981).......................................................39

*Gray v. U.S. Army Crim. Investigation Command*,
  742 F. Supp. 2d 68 (D.D.C. 2010)..................................................37

*Hodge v. FBI*,
  703 F.3d 575 (D.C. Cir. 2013).......................................................42

*Hollis v. U.S. Dep't of Army*,
  856 F.2d 1541 (D.C. Cir. 1988).....................................................15

*In re Motions of Dow Jones & Co.*,
  142 F.3d 496 (D.C. Cir. 1998)..................................................39, 40

*In re Sealed Case No. 99-3091*,
  192 F.3d 995 (D.C. Cir. 1999).......................................................40

*Judicial Watch v. U.S. Dep't of Homeland Sec.*,
  598 F. Supp. 2d 93 (D.D.C. 2009)..................................................26

*Kimberlin v. Dep't of Justice*,
  139 F.3d 944 (D.C. Cir. 1998)...................................18, 19, 20, 25

*Long v. U.S. Dep't of Justice*,
  450 F. Supp. 2d 42 (D.D.C. 2006)..................................................36

*Lopez v. U.S. Dep't of Justice*,
    393 F.3d 1345 (D.C. Cir. 2005).....................................................41

*Maydak v. U.S. Dep't of Justice*,
    218 F.3d 760 (D.C. Cir. 2000)......................................................33

*Mayer Brown LLP v. IRS*,
    562 F.3d 1190 (D.C. Cir. 2009)...............................................46, 47

*Mays v. DEA*,
    234 F.3d 1324 (D.C. Cir. 2000)....................................................45

*Mead Data Cent., Inc., v. U.S. Dep't of Air Force*,
    566 F.2d 242 (D.C. Cir. 1977)......................................................19

*Multi AG Media LLC v. Dep't of Agric.*,
    515 F.3d 1224 (D.C. Cir. 2008)...............................................14, 23

*Nat'l Archives & Records Admin. v. Favish*,
    541 U.S. 157 (2004).....................................................28, 29, 30, 31

*Nat'l Ass'n of Home Builders v. Norton*,
    309 F.3d 26 (D.C. Cir. 2002)........................................................15

*Nat'l Ass'n of Retired Federal Employees v. Horner*,
    879 F.2d 873 (D.C. Cir. 1989)......................................................23

*\*Nation Magazine v. U.S. Customs Serv.*,
    71 F.3d 885 (D.C. Cir. 1995)......................................15, 17, 18, 36

*NLRB v. Robbins Tire & Rubber Co.*,
    437 U.S. 214 (1978) ........................................................33, 34, 35

*\*North v. Walsh*,
    881 F.2d 1088 (D.C. Cir. 1989)...............................................34, 35

*Prison Legal News v. Exec. Office of U.S. Attorneys*,
    628 F.3d 1243 (10th Cir. 2011) ...................................................18

*Roth v. U.S. Dep't of Justice*,
  642 F.3d 1161 (D.C. Cir. 2011)..............................................37, 42, 43, 44, 45

*SafeCard Servs., Inc. v. SEC*,
  926 F.2d 1197 (D.C. Cir. 1991)....................................................................10

*Schiller v. NLRB*,
  964 F.2d 1205 (D.C. Cir. 1992)................................................................ 38-39

*SEC v. Dresser Industries, Inc.*,
  628 F.2d 1368 (D.C. Cir. 1980)....................................................................39

*Senate of Puerto Rico ex rel. Judiciary Comm. v. U.S. Dep't of Justice*,
  823 F.2d 574 (D.C. Cir. 1987)................................................................40, 41

*Showing Animals Respect & Kindness v. U.S. Dep't of Interior*,
  730 F. Supp. 2d 180 (D.D.C. 2010)........................................................18, 30

*Steinberg v. U.S. Dep't of Justice*,
  23 F.3d 548 (D.C. Cir. 1994)........................................................................20

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*,
  489 U.S. 749 (1989)............................................................22, 28, 29, 31, 32

*United States v. Landano*,
  508 U.S. 165 (1993)................................................................................36, 45

*United States v. Ring*,
  08-cr-0274 (D.D.C.) ....................................................................................21

*United States v. Safavian*,
  05-cr-0370 (D.D.C.) ....................................................................................21

*United States v. Verrusio*,
  09-cr-0064 (D.D.C.) .................................................................................4, 21

*Vaughn v. Rosen*,
  484 F.2d 820 (D.C. Cir. 1973)................................................................19, 31

*Washington Post Co. v. U.S. Dep't of Health & Human Servs.*,
  690 F.2d 252 (D.C. Cir. 1982)........................................................24

*Weisberg v. Dep't of Justice*,
  627 F.2d 365 (D.C. Cir. 1980)........................................................20

## STATUTES

5 U.S.C. § 552 ..............................................................................1

5 U.S.C. § 552(a)(4)(B) ...............................................................1

5 U.S.C. §§ 552(b)(3)-(7)(E) ......................................................1

5 U.S.C. § 552(b)(6)....................................................................15

5 U.S.C. § 552(b)(7)(A)..........................................................32, 37

5 U.S.C. § 552(b)(7)(C)..............................................................15

28 U.S.C. § 1291 ..........................................................................1

28 U.S.C. § 1331 ..........................................................................1

## RULE

Fed. R. Crim. P. 6(e) .............................................................13, 39, 40

## REGULATIONS

28 C.F.R. § 16.5(d) .......................................................................6

28 C.F.R. § 16.5(d)(1)(iv) ...........................................................28

# GLOSSARY

| | |
|---|---|
| CREW | Citizens for Responsibility and Ethics in Washington |
| DOJ | United States Department of Justice |
| FBI | Federal Bureau of Investigation |
| FOIA | Freedom of Information Act |
| JA | Joint Appendix |

## STATEMENT OF JURISDICTION

Pursuant to 28 U.S.C. § 1291, this Court has jurisdiction over this timely appeal filed on July 20, 2012, JA 185, from a final judgment of the United States District Court for the District of Columbia that was entered on June 12, 2012. JA 184. The district court's jurisdiction was based on 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

## STATEMENT OF THE ISSUE

Whether the district court erred in upholding the United States Department of Justice's ("DOJ") reliance on a categorical exemption to withhold information pursuant to Exemptions 3, 6, 7(A), 7(C), 7(D), and 7(E) of the Freedom of Information Act, 5 U.S.C. §§ 552(b)(3)-(7)(E) ("FOIA").

## STATUTES AND REGULATIONS

This litigation involves the application of the FOIA, 5 U.S.C. § 552, which has been reproduced in the Addendum to this brief.

## STATEMENT OF THE CASE

This appeal arises from a FOIA request filed with the Federal Bureau of Investigation ("FBI"), a component of the U.S. Department of Justice, on October 19, 2010. The request seeks witness statements, investigation reports, prosecution memoranda, and FBI 302 reports related to DOJ's investigation of former House Majority Leader Tom DeLay (R-TX), as well as records related to DOJ's

1

investigation of Mr. DeLay and 14 individuals and entities.  JA 51.  Plaintiff

explained the purpose of its request is "to contribute to greater public awareness of

alleged malfeasance and possible criminal behavior" by Mr. DeLay, JA 53, and to

"shed light on DOJ's conduct in conducting the investigation of Mr. DeLay, and

its apparent decision to close the investigation without bringing charges against

Mr. DeLay."  JA 54.

　　　　The government moved for summary judgment, relying on a declaration

from the FBI describing the search the agency conducted and the three broad

categories of documents that search yielded, which were found in the FBI's file of

its lobbying investigation of Jack Abramoff and others.  JA 30-31, ¶ 24.  The

government claimed the requested documents were subject to a categorical

exemption under FOIA Exemptions 6 and 7(C), as well as Exemptions 2, 3, 7(A),

7(D), and 7(E).  The FBI justified its invocation of a categorical exemption under

Exemption 6 and 7(C) solely on the claimed need to protect Mr. DeLay's privacy

in being associated publicly with a criminal investigation.  With respect to all

exemptions claimed, DOJ did not provide a *Vaughn* index or otherwise explain the

specific nature of the withheld documents.

　　　　Plaintiff opposed this motion and filed a cross-motion for partial summary

judgment, explaining where, as here, the claimed privacy interest the government

seeks to protect already is a matter of public knowledge, reliance on a categorical

exemption is improper.  Plaintiff pointed to the public statements made by Mr. DeLay and his attorney acknowledging his association with DOJ's criminal investigation, as well as the press releases DOJ issued touting its success in securing convictions and plea agreements with a number of individuals as part of this investigation.  Plaintiff also identified the more than 30 witnesses, including FBI special agents, who had testified at three of the related criminal trials, at least some of whom were named in plaintiff's FOIA request.

The district court granted the government's motion for summary judgment, concluding Mr. DeLay has a substantial privacy interest that is not outweighed with what the court characterized as a "minimal" public interest in disclosure.  The court further concluded the documents were exempt under FOIA exemptions 2, 3, 7(A), 7(D), and 7(E), notwithstanding DOJ's failure to produce a *Vaughn* index or otherwise describe the withheld documents and correlate their disclosure with a specified harm protected by the FOIA.  Plaintiff filed a timely appeal from the district court judgment.

## STATEMENT OF FACTS

## I.    FACTUAL BACKGROUND

In 2004, DOJ and its component, the FBI, initiated an investigation into the activities of former lobbyist Jack Abramoff and his associates.  The FBI has characterized this investigation as "a wide-ranging public corruption investigation

3

as part of its [DOJ's] ongoing efforts to root out systemic corruption within the highest levels of government." JA 29, ¶ 22. Since its inception, this criminal investigation yielded 18 guilty pleas and three criminal convictions.[1] In January 2006, Mr. Abramoff himself pleaded guilty to charges of conspiracy, aiding and abetting honest services mail fraud, and tax evasion, and was sentenced to 48 months in prison. JA 29-30, ¶¶ 22 and 23 n.10.

During three criminal trials DOJ has identified as arising from its public corruption investigation, more than 30 individuals testified, including a number of FBI agents. *See* JA 166-168, ¶¶ 3-5 (listing witnesses, including by title as "FBI Special Agent"). In addition, through press releases, DOJ touted those individuals who had been indicted, convicted, and/or pleaded guilty to the charges against them. JA 140, 143, 145, 147-48, 150-51, 153, 155-56, 158-59.

In August 2010, Mr. DeLay announced publicly DOJ had informed him the agency would not bring criminal charges against him in connection with his relationship with Mr. Abramoff. Mr. DeLay stated he had cooperated fully with the DOJ investigation, providing investigators more than 1,000 pages of documents and emails. JA 161-612. He also stated, "While I will never

---

[1] While this case was before the district court the FBI submitted a declaration identifying the number of guilty pleas and convictions as 20. *See* JA 30, ¶ 23. Since that time, there has been one additional conviction of Fraser Verrusio, a former congressional aide. *See United States v. Verrusio*, 09-cr-0064 (D.D.C.).

understand why it took so long for the Justice Department to conclude that I was innocent, I am nevertheless pleased that they have made their determination." *Id.* In addition, Mr. DeLay's attorney, Richard Cullen, stated publicly, "a prosecutor from [DOJ's] Public Integrity Section phoned him with the news . . . and said he was free to make it public." *Id.*

Mr. Cullen further revealed DOJ's decision not to prosecute Mr. DeLay also covered his wife, Christine DeLay.  JA 58-59.  Previously, Mr. Cullen had publicly described the nature of that investigation, which he characterized as "a very thorough investigation into all aspects of Mrs. DeLay's employment," and acknowledged giving DOJ documents "that demonstrate clearly that she was an integral part of Tom DeLay's political operation."  JA 92.

Reportedly, DOJ declined to prosecute Mr. DeLay because "prosecutors were unable to compel incriminating testimony by a former DeLay aide, Edwin A. Buckham, and find other witnesses or evidence that could have led to a conviction."  JA 58. It was also reported that DOJ's investigation of Mr. DeLay "focused in part on payments" worth nearly a half million dollars "made by Buckham . . . to cover some of DeLay's expenses on an overseas golf trip."  *Id.* These payments made both Mr. DeLay and Mr. Buckham "two of the principal targets in the department's multifaceted probe of Abramoff's lobbying practice." *Id.*  One press report characterized DOJ's decision not to prosecute Mr. DeLay as

"a stark footnote to the lobbying scandals that helped Democrats in 2006 regain the House majority," scandals that led to Mr. Delay, "one of Washington's top power brokers," being nicknamed "'The Hammer.'" JA 161.

## II.    PROCEDURAL HISTORY

On October 19, 2010, two months after Mr. DeLay publicly announced DOJ's decision not to prosecute him, CREW filed a FOIA request with the FBI for records from the now-closed investigation of Mr. DeLay.[2]  Specifically, CREW requested witness statements, investigation reports, prosecution memoranda, and FBI 302 reports related to DOJ's investigation of Mr. DeLay.  JA 51.  In addition, CREW requested records related to DOJ's investigation of Mr. DeLay and 14 individuals and entities:  Christine DeLay, Dani DeLay, Jack Abramoff, Edwin Buckham, Tony Rudy, Michael Scanlon, Susan Hirshmann, the Alexander Strategy Group, the National Center for Public Policy Research, eLottery, Inc., the U.S. Family Network, Americans for a Republican Majority PAC, Texans for a Republican Majority PAC, and/or the Commonwealth of the Northern Marianas Islands.  *Id.*

CREW also requested that DOJ expedite processing of its request pursuant to 28 C.F.R. § 16.5(d), explaining:  (1) how the request pertains to a matter for

---

[2] At the same time, CREW filed an identical request with DOJ's Criminal Division.  There are no outstanding issues concerning that request, which is not before this Court.

which there is an "urgency to inform the public about the actual or alleged federal government activity," and (2) how it involves a matter of "widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence."  JA 55; 103-104.  On October 25, 2010, DOJ's Office of Public Affairs granted CREW's request for expedited processing, agreeing the request concerned a matter of "widespread and exceptional media interest . . . in which there exist possible questions about the government's integrity which affect public confidence."  JA 105.

The FBI acknowledged receipt of CREW's FOIA request by letter dated October 22, 2010, and indicated that without the express authorization of "the third party" – an apparent reference to Mr. DeLay – any release of information to CREW would violate the Privacy Act.  JA 107.  The FBI further asserted the requested records are exempt from disclosure under the FOIA on privacy grounds. *Id.*  CREW filed an administrative appeal from this determination with DOJ's Office of Information Policy on November 9, 2010, JA 111-14, and that office closed the appeal without decision after CREW initiated this action.  JA 118.

Once in litigation, the FBI acknowledged for the first time that despite its administrative response to CREW stating the FBI could not respond without a privacy waiver, the agency had located responsive documents after conducting a search of the FBI's Central Records System for records indexed under Mr.

7

DeLay's name.  JA 31, ¶ 24.  According to the FBI, this search yielded three

categories of responsive documents:  (1) "FD-02 and FC-302 inserts ('Interview

Forms'/'Witness Statements')," JA 36, ¶ 35; (2) "Investigative Materials/Reports,"

*id.*, JA 38-39, ¶ 40; and (3) "Public Source File[s]."  JA 39, ¶ 41.

     DOJ moved for summary judgment before the district court, arguing its

policy and practice of categorically withholding documents in response to

requests for third-party information based on Exemptions 6 and 7(C) fully comply

with its legal obligations under the FOIA.  DOJ justified this approach as

necessary to prevent revealing to the public the fact that Mr. DeLay was the

subject of an investigation, because the mere association of him with a criminal

investigation would invade his privacy.  In support of this argument, the FBI

submitted the declaration of David M. Hardy, chief of the Record/Information

Dissemination Section, Record Management Division, of the FBI.  JA 18, ¶ 1.  Mr.

Hardy also described the FBI's search of the Central Records System, which

identified records related to "the lobbying investigation related to Jack Abramoff

and others," that mentioned Mr. DeLay.  JA 31, ¶ 24.  The FBI did not search for

the "numerous other instances in which Mr. DeLay's name is mentioned in

documents throughout the file but which were not indexed" to his name.  *Id.*

     The FBI also asserted Exemption 7(A) as grounds for withholding

investigation reports, witness statements, and FBI 302s, JA 35, ¶ 31.  The FBI

failed both to identify the number of documents it was withholding in each category, and to tie their disclosure to a specific harm. Instead, the agency merely noted: "[t]he investigation is open and ongoing" in support of its reliance on Exemption 7(A), citing to sentencing hearings related to Mr. Rudy, Mr. Boulanger, and Mr. Ring that at that time had not yet been completed. JA 34, ¶ 29. Further, the FBI claimed the withheld documents fall within the protection of FOIA Exemptions 2, 3, 7(D), and 7(E). JA 39-44, 47-48.

In opposing the FBI's motion for summary judgment, CREW pointed to the public acknowledgment by Mr. DeLay and his attorney that he was the subject of DOJ's investigation, that he had cooperated with the agency's investigators, and that DOJ had declined to prosecute him as evidence the information the FBI sought to protect already was in the public domain. CREW also identified the more than 30 individuals who had testified publicly in criminal trials DOJ identified as arising from its "public corruption investigation," JA 166-68, ¶¶ 3-5, a number of whom were named in CREW's FOIA request. CREW also delineated the individuals identified publicly in DOJ press releases as having been charged, convicted, or otherwise implicated in DOJ's public corruption investigation. They include Todd Boulanger, James Hirni, Trevor Blackann, Horace Cooper, Neil Volz, Ann Copland, Glenn Marshall, Kevin Ring, David Safavian, Italia Federici,

J. Steven Griles, Jared Carpenter, Rep. Robert W. Ney, and Roger G. Stillwell. JA 140, 143, 145, 147-48, 150-51, 153, 155-56, 158-59.

By opinion and order entered on June 12, 2012,[3] the district court granted defendant's summary judgment motion on all claims. 870 F. Supp. 2d 70 (D.D.C. 2012). While the court acknowledged the FBI investigation had been "officially recognized," *id.* at 80 n.10, the court concluded Mr. DeLay had not waived his privacy interest, *id.* at 80. Characterizing the documents CREW seeks as "'not very probative of [the DOJ's] behavior or performance,'" and citing *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1205 (D.C. Cir. 1991), *id.* at 81, the court found the balance of interests weighs in favor of withholding pursuant to FOIA Exemptions 6 and 7(C). *Id.* The court did not address CREW's claim that the FBI cannot rely on a categorical exemption claim to protect the fact that an individual is associated with a criminal investigation where, as here, that fact already is publicly known.

The district court further found the records were wholly exempt pursuant to FOIA Exemption 7(A), without requiring the FBI either to identify the specific documents it was withholding, or to demonstrate how disclosing each of those documents would interfere with pending criminal enforcement proceedings. 870

---

[3] The opinion and order were dated June 8, 2012, but not entered until June 12, 2012. *See* JA 184.

F. Supp. 2d at 82. Similarly, the court upheld the FBI's categorical reliance on FOIA Exemptions 2,[4] 3, 7(D), and 7(E) without requiring the FBI either to identify the specific documents it was withholding, or to demonstrate how disclosure of each would result in the harms protected by these exemptions. *Id.* at 83-85.

## SUMMARY OF ARGUMENT

This case arises against the backdrop of a vast web of public corruption that entangled many of Washington's powerful elite, including former House Majority Leader Tom DeLay. The public had a ringside seat, as prosecutions of Jack Abramoff and many of his associates played out in public view, and trial witness after trial witness provided the seamy details of Mr. Abramoff's criminal enterprise. In the end, the government secured convictions of, or plea agreements with, 21 individuals, who included lobbyists, public officials, congressional staffers, Abramoff colleagues, and one former member of Congress, Rep. Robert Ney (R-OH). This case concerns Mr. DeLay, one of the public figures whose association with Jack Abramoff and investigation by DOJ did not end with jail time, although two of his senior aides, Tony Rudy and Michael Scanlon, were convicted.

In multiple forums, Mr. DeLay, his attorney, and the government itself acknowledged his implication in DOJ's public corruption investigation. Yet,

---

[4] CREW is not challenging the FBI's invocation of Exemption 2.

when CREW sought documents from DOJ's now-closed investigation of Mr.

Delay under the FOIA, the agency responded with claims of categorical

exemptions, insisting Mr. DeLay's privacy interest demanded protection from the

public disclosure of his association with DOJ's criminal inquiry pursuant to FOIA

Exemptions 6 and 7(C). The district court below agreed, without considering the

factual context in which DOJ's categorical exemption claims were made, and

without properly balancing the strong public interest in disclosure here.

FOIA Exemptions 6 and 7(C) do not properly apply where, as here, the sole

privacy interest advanced by the government already is a matter of public record.

Consequently, there is nothing to balance against the public interest in disclosure.

But even if that balancing were required, here it would tip decisively in favor of

disclosure. CREW made its request to shed light on DOJ's conduct in

investigating Mr. DeLay, "one of Washington's top power brokers,"[5] and its

decision to close that investigation without bringing charges against him.

Ample authority recognizes the kind of public investigation DOJ conducted here

as "*per se . . . of public concern.*" *Common Cause v. Nat'l Archives & Records*

*Admin.*, 628 F.2d 179, 183 n.10 (D.C. Cir. 1980). The public interest in

information concerning how DOJ enforces ethics and anti-corruption laws

---

[5] JA 161.

12

governing the activities of high-profile public officials such as Mr. DeLay is manifest.

The district court also erred in relying on DOJ's categorical withholding of all responsive documents under Exemption 7(A) to prevent claimed undue interference with a criminal investigation. The court failed to take into account the particular circumstances here, which include several public proceedings, numerous DOJ press releases, and the public identification of a host of individuals involved or associated with DOJ's public corruption investigation. The range of circumstances here does not support an inference the requested materials are categorically exempt under Exemption 7(A).

Similarly, the district court erred in accepting DOJ's categorical withholdings under FOIA Exemptions 3, 7(D), and 7(E). The court could not properly conclude the withheld material was subject to the protection of Fed. R. Crim. P. 6(e) as grand jury material, and therefore within the scope of FOIA Exemption 3, without the kind of detailed information provided in a *Vaughn* index. Nor was there a factual basis for the FBI's assertion of a categorical withholding for confidential source material under Exemption 7(D). DOJ's entirely generic showing here, with no reference to the specific circumstances this case presents, stands in stark contrast to the kind of detail this Court has held is required for an agency to meet its burden under Exemption 7(D).

Finally, the district court erred in upholding DOJ's categorical invocation of

Exemption 7(E).  Absent a showing that would have informed the district court

about the withheld information, the court could only speculate on the risk of

circumventing the law disclosure would pose.  Such speculation is no substitute

for the information this Court has required to sustain an agency's reliance on

Exemption 7(E).

### STANDARD OF REVIEW

This Court reviews district court grants of summary judgment *de novo*.

*Multi AG Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1227 (D.C. Cir. 2008).

### ARGUMENT

**I.     DOJ'S CATEGORICAL WITHHOLDING OF ALL RESPONSIVE DOCUMENTS UNDER FOIA EXEMPTIONS 6 AND 7(C) TO PREVENT REVELATION OF MR. DELAY'S ASSOCIATION WITH A CRIMINAL INVESTIGATION IS UNLAWFUL.**

**A.     DOJ Has Failed To Identify A Cognizable Privacy Interest Of Mr. DeLay That Justifies A Categorical Withholding.**

Exemptions 6 and 7(C) were enacted "to protect the privacy of individuals

identified in certain agency records."  *Am. Civil Liberties Union v. U.S. Dep't of*

*Justice*, 655 F.3d 1, 5 (D.C. Cir. 2011) ("*ACLU v. DOJ*").  Exemption 6 protects

documents "the disclosure of which would constitute a clearly unwarranted

invasion of personal privacy," and Exemption 7(C) protects law enforcement

records where disclosure "could reasonably be expected to constitute an

14

unwarranted invasion of personal privacy."  5 U.S.C. §§ 552(b)(6) and 7(C).

While the FBI relies on both exemptions here, this Court need consider only

Exemption 7(C), which imposes a higher standard of demonstrating a "clearly

unwarranted" invasion of privacy to justify disclosure.  *See ACLU v. DOJ*, 655

F.3d at 6.

   The protection of individual privacy interests advanced by FOIA

Exemptions 6 and 7(C) is not boundless, and is cabined when the individual in

question chooses to place the information that implicates those privacy interests in

the public domain.  *See Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 896

(D.C. Cir. 1995); *Hollis v. U.S. Dep't of Army*, 856 F.2d 1541, 1545 (D.C. Cir.

1988) (release of information already accessible to the general public does not

implicate privacy interests).  Moreover, like all exemptions, Exemptions 6 and

7(C) "'do not obscure the basic policy that disclosure, not secrecy, is the dominant

objective of the Act.'"  *ACLU v. DOJ*, 655 F.2d at 5 (citing *Nat'l Ass'n of Home

Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002)).

   The dispute here centers on whether DOJ can continue to rely on FOIA

Exemptions 6 and 7(C) to withhold the fact that Mr. DeLay was associated with

the agency's criminal investigation of public corruption, even though Mr. DeLay

and his attorney acknowledged that association publicly.  This issue must be

evaluated within the specific factual context of the FBI's justification for

15

categorically withholding all responsive documents. The FBI responded to CREW's request with what it characterized as "an Exemption 6 and 7(C) Glomar response, neither confirming nor denying the existence of records related to" Mr. DeLay. JA 28-29, ¶ 21. The FBI described this practice as based on the need to prevent the public from "draw[ing] adverse inferences from the mere fact that an individual is mentioned in the files of a criminal law enforcement agency such as the FBI." JA 24-25, ¶ 18. According to the FBI, Mr. DeLay's privacy interest in being protected from this adverse inference "is not extinguished merely because the public may be aware – by virtue of media coverage – that an individual who has been the subject of a state prosecution may have also been the target of a federal investigation." JA 28, ¶ 20. In other words, the FBI asserted a categorical withholding under Exemptions 6 and 7(C) to protect Mr. DeLay's privacy interest in not being publicly identified as associated with a criminal investigation.

Here, however, Mr. DeLay already revealed that very association when he and his attorney announced publicly – months before CREW filed its FOIA request – he had cooperated with criminal investigators and DOJ was not prosecuting him. *See* JA 161-62. Similarly, the FBI's concession in this litigation that it has records concerning Mr. DeLay "in the main file of the lobbying investigation related to Abramoff and others," JA 30-31, ¶ 24, also reveals a connection between Mr. DeLay and DOJ's criminal investigation, the

very harm the FBI claims it must prevent by withholding all responsive records pursuant to Exemptions 6 and 7(C). These facts, standing alone, invalidate the only interest animating DOJ's reliance on a categorical withholding: the claimed need to protect Mr. DeLay from the stigma of being associated with DOJ's public corruption investigation.

In this regard, Mr. DeLay stands in the same shoes as the plaintiff in *Nation Magazine*, former presidential candidate H. Ross Perot, who was found to have waived his privacy interests when he similarly made several public statements implicating the very information the Customs Service sought to protect. There, as here, the agency relied on a categorical "Glomar response" under FOIA Exemption 7(C) in responding to a request for records indexed or cross-referenced under Mr. Perot's name. The agency claimed this response was necessary to protect against the "stigmatizing connotation" of disclosing "the mere fact that an individual is mentioned in an agency's law enforcement files." 71 F.3d at 888 (quotation omitted). This Court rejected this claim, reasoning:

> Perot's decision to bring information connecting himself with such efforts into the public domain differentiates his privacy interests from the interest of unnamed [individuals] who did not voluntarily divulge their identities; these public disclosures effectively waive Perot's right to redaction of his name from documents on events that he has publicly discussed.

17

*Id.* at 896 (footnote omitted).  *See also Prison Legal News v. Exec. Office of U.S. Attorneys*, 628 F.3d 1243, 1249 (10th Cir. 2011) ("An individual can waive his privacy interests under FOIA when he affirmatively places information of a private nature into the public realm."); *Showing Animals Respect & Kindness v. U.S. Dep't of Interior*, 730 F. Supp. 2d 180, 191 (D.D.C. 2010) ("presumption [of privacy protection] does not apply where an individual has voluntarily disclosed his involvement in the records at issue") (citation omitted).

Accordingly, the district court erred when it ignored the sole reason advanced by the FBI for employing a categorical response under Exemptions 6 and 7(C), to conclude Mr. DeLay's public acknowledgment of his association with DOJ's public corruption investigation did not operate as a waiver.  Moreover, while it may be true that, as the court reasoned, Mr. DeLay "still maintains a substantial privacy interest in the *substance* of the investigation,"[6] the FBI did not assert a categorical withholding to protect the substance of DOJ's public corruption investigation.

To be sure, at least some of the "'details' of the investigation"[7] may, in fact, contain information that implicates privacy interests of Mr. DeLay and others, and

---

[6] 870 F. Supp. 2d at 80 (emphasis added).

[7] *Id.* (citing *Kimberlin v. Dep't of Justice*, 139 F.3d 944, 949 (D.C. Cir. 1998)).

therefore, upon a proper showing, may fall within Exemptions 6 and 7(C). And

CREW does not dispute that any waiver effected by Mr. DeLay disclosing

publicly he was investigated and cleared by DOJ does not, standing alone, reach

all of those details. But the district court could not properly reach a conclusion

those details are exempt without first examining the specific justification for each

withholding – the kind of information typically found in a *Vaughn* index[8] – and

concluding, after a balancing of interests, that the privacy interests outweigh the

public's interest in disclosure. As this Court stated in *Kimberlin v. Dep't of*

*Justice*:

> In order to withhold an entire file pursuant to Exemption
> 7(C), the Government must show that disclosure of any
> part of the file 'could reasonably be expected to
> constitute an unwarranted invasion of personal privacy.'
> Moreover, the Government must make that showing in

---

[8] In *Vaughn v. Rosen*, 484 F.2d 820, 828 (D.C. Cir. 1973), this Circuit established the "procedural requirements" that "an agency seeking to avoid disclosure" must follow to carry its burden of proof. Those requirements have been described as including "a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977) (citation omitted). *See also Birch v. U.S. Postal Serv.*, 803 F.2d 1206, 1209 (D.C. Cir. 1986) (to support an exemption claim agency bears burden of providing "'a relatively detailed justification' for assertion of an exemption, and must demonstrate to a reviewing court that records are clearly exempt.") (citing *Mead Data Cent., Inc.*, 566 F.2d at 251).

its *Vaughn* index and in such affidavits as it may submit therewith.

139 F.3d at 949-950 (citation omitted).[9]

There is no dispute DOJ did not provide a detailed justification for its withholdings that identified the number of documents being withheld, and the nature of and justification for each withholding, including why disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* Instead, DOJ attempted to short-circuit this process by asserting a categorical exemption for the entire investigative file based solely on the claimed need to protect Mr. DeLay's association with a criminal investigation. Once that sole justification evaporated, DOJ was required to perfect specific exemption claims, something the agency has yet to do.

The district court also concluded third parties and FBI special agents named in the responsive documents "have substantial privacy interests" that support the FBI's reliance on a categorical withholding under Exemptions 6 and 7(C). 870 F.

---

[9] For these same reasons, in the absence of a *Vaughn* index or any indication of the amount of material the FBI purportedly located, it was simply impossible for CREW or the Court to assess the reasonableness of the FBI's search. *See Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 552 (D.C. Cir. 1994) ("agency affidavits that 'do not provide information specific enough to enable [the requester] to challenge the [search] procedures utilized' are insufficient to support summary judgment") (quoting *Weisberg v. Dep't of Justice*, 627 F.2d 365, 371 (D.C. Cir. 1980)). As such, DOJ failed to establish the adequacy of the FBI's search.

Supp. 2d at 80 n.13.  Given the factual context of this case, however, the court could not properly reach that conclusion without evaluating the nature of each withholding and the extent to which it implicates privacy interests, and determining whether those interests outweigh the public's interest in disclosure.

That did not occur here; instead, the FBI asserted a categorical exemption for this material as well.  But just as the public already is privy to the information DOJ seeks to protect by withholding documents related to Mr. DeLay – his association with a criminal investigation – it also is privy to a wealth of information  concerning many of the individuals named in CREW's FOIA request that associates them with DOJ's public corruption investigation.  For example, CREW's FOIA request sought, *inter alia*, documents related to Mr. DeLay's connection with Jack Abramoff, Tony Rudy, and Michael Scanlon, JA 51, all individuals who were convicted or pleaded guilty.  Because of their public prosecutions, none of these individuals retains a privacy interest simply in being associated with DOJ's public corruption investigation.

Similarly, more than 30 individuals and agency personnel already have been listed as trial witnesses in three criminal prosecutions arising out of DOJ's public corruption investigation, *United States v. Verrusio*, 09-cr-0064 (D.D.C.); *United States v. Ring*, 08-cr-0274 (D.D.C.); and *United States v. Safavian*, 05-cr-0370 (D.D.C.).  JA 166-68, ¶¶ 3-5.  As a necessary consequence, none is properly

21

within the scope of a categorical privacy exemption based on a stated need to

protect any of these witnesses from being associated with a criminal investigation.

Other individuals have been publicly associated with DOJ's criminal investigation

as a result of press releases DOJ itself issued, touting its investigative efforts that

led to charges and convictions.  *See* JA 140, 143, 145, 147-48, 150-51, 153, 155-

56, 158-59.  In attempting to categorically withhold all this information, DOJ is

like the child who murders his parents and then throws himself on the mercy of the

court as an orphan.  The agency publicly tied any number of individuals, including

Mr. DeLay, to a criminal inquiry, and is now claiming a need to protect those very

same people from being connected to that investigation.  Under such

circumstances, DOJ's categorical withholding of the requested records based only

on a claimed need to protect Mr. DeLay and these individuals from being

associated with DOJ's public corruption investigation cannot be sustained.

### B.  Both DOJ And The District Court Improperly Discounted The Substantial Public Interest In The Requested Records.

As construed by the courts, Exemption 7(C) requires agencies and

reviewing courts to weigh the public interest in disclosure against the privacy

interests in non-disclosure.  *See*, *e.g.*, *U.S. Dep't of Justice v. Reporters Comm. for*

*Freedom of the Press*, 489 U.S. 749, 762 (1989).  The district court here purported

to conduct that balance to conclude the public interest in disclosure is "minimal,"

22

and "does not outweigh the substantial privacy interests of Mr. DeLay and other third parties in the contents of the documents."  870 F. Supp. 2d at 81.  This conclusion flows from a fundamental misconstruction of the privacy interests DOJ claimed were implicated by the requested documents, and the nature of the public's interest in the requested material.

As discussed herein, DOJ asserted only a single privacy interest to support its categorical Exemption 6 and 7(C) claims – the need to protect Mr. DeLay from being associated with a criminal investigation.  With that proverbial cat out of the bag, there simply is nothing to weigh against the public interest in disclosure.  *See Multi AG Media LLC v. Dep't of Agric.*, 515 F.3d at 1230 (balancing occurs only where there is "a greater than *de minimis* privacy interest in the requested information").  But while the court accordingly "need not linger over the balance,"[10] there nevertheless is a substantial public interest in disclosing the requested materials, which both DOJ and the district court ignored completely.

As CREW explained when it sought a fee waiver and expedited processing of its request, "the requested documents . . . would shed light on DOJ's conduct in conducting the investigation of Mr. DeLay, and its apparent decision to close the investigation without bringing charges against Mr. DeLay."  JA 103-04.  Mr.

---

[10] *Nat'l Ass'n of Retired Federal Employees v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989).

DeLay is the former House Majority Leader and was viewed as "one of Washington's top power brokers," JA 161. Before Mr. DeLay announced he no longer was being investigated by DOJ, he was the subject of frequent press reports about his connection to Jack Abramoff, and the gifts and money he received in apparent exchange for legislative favors. *See*, *e.g.*, JA 66-71, 73-75, 77-79, 81-84, 86-90, 92, 94-96, 98-100. This public interest stemmed in large part from his former powerful position and allegations he misused that position by trading gifts and campaign contributions for political influence.

Indeed, DOJ set its sights on Mr. DeLay as part of a massive public corruption investigation of federal officials and those who sought to buy their influence. FBI Director Robert Mueller described public corruption as the agency's "No. 1 priority on the criminal side." JA 92. Ample authority recognizes such matters as "*per se* . . . of public concern." *Common Cause v. Nat'l Archives & Records Admin.*, 628 F.2d at 183 n.10 ("the [Federal Corrupt Practices Act] . . . amounts to a Congressional pronouncement that the circumstances surrounding campaign contributions are *per* se matters of public concern") (citation omitted). *See also Washington Post Co. v. U.S. Dep't of Health & Human Servs.*, 690 F.2d 252, 265 (D.C. Cir. 1982) ("Our belief that public disclosure of conflict-of-interest information is vital is strengthened by Congress's passage of the Ethics in Government Act of 1978.) (footnote omitted); *Dow Jones & Co. v. U.S. Dep't of*

24

*Justice*, 724 F. Supp. 985, 990-91 (D.D.C. 1989), *aff'd in part*, *rev'd in part*, 917 F.2d 571 (D.C. Cir. 1989) ("The federal statute requiring disclosure of acceptance of free meals [by members of Congress] . . . tips the balance in favor of disclosure.") (footnote omitted); *Cong. News Syndicate v. U.S. Dep't of Justice*, 438 F. Supp. 538, 545 (D.D.C. 1977) (recognizing "the undeniable public interest concerning the details of an illicit political fundraising operation in which members of the White House staff participated"). The public interest in information concerning how DOJ enforces ethics and anti-corruption laws governing the activities of high-profile public officials such as Mr. DeLay is manifest. *See Kimberlin*, 139 F.3d at 949 ("it will ordinarily be enough for the court to consider, when balancing the public interest in disclosure against the private interest in exemption, the rank of the public official involved and the seriousness of the misconduct alleged.") (citation omitted).

The district court ignored this context of CREW's request, instead focusing narrowly on the "identifying information and factual information" purportedly contained in the requested documents. 870 F. Supp. 2d at 81 (citation omitted). Absent a *Vaughn* index, however, the contents of the requested documents are a matter of bald speculation; there simply was no factual basis for the district court's characterization of the withheld information. The withheld documents "could well be suffused, from top to bottom, with information about DOJ's performance of its

25

duties." *Judicial Watch v. U.S. Dep't of Homeland Sec.*, 598 F. Supp. 2d 93, 96 (D.D.C. 2009).  But unless DOJ "conduct[s] an assessment of each responsive document to determine whether it was exempt," there is no basis to conclude the privacy interest outweighs the public interest in disclosure.  *Id.*

In any event, facts of this nature do shed light on how DOJ enforces ethics and anti-corruption laws, as they reveal the strengths of the government's case, and allow the public to independently evaluate DOJ's decision not to prosecute Mr. DeLay.  This case does not involve a garden-variety claim of public interest, but rather the manner in which DOJ pursued high-profile allegations of public corruption, a matter in which there is a substantial and demonstrated public interest.  Indeed, after Mr. DeLay announced DOJ would not prosecute him, media reports highlighted the controversy surrounding that and other DOJ decisions not to pursue allegations of corruption against members of Congress.  One report proclaimed, "the government's premier anticorruption agency has lost its nerve after the disastrous collapse last year of its case against former Senator Ted Stevens."  JA 170-72.  Another observed, "[e]thics groups are wondering whether the U.S. Department of Justice has become skittish when it comes to investigating members of Congress, after numerous congressional corruption investigations were closed without trial last year."  JA 174.  *See also CREW v. U.S. Dep't of Justice*, 840 F. Supp. 2d 226, 234 (D.D.C. 2012) ("[I]n these days of political

turmoil, constant accusations and name calling, and concern about our economic and social future, there is, if anything, a heightened public interest in learning what the Government is 'up to.'") (citation and footnote omitted).

Further reinforcing the public interest in the material CREW seeks is DOJ's own admission, in granting CREW's request for expedition, that this FOIA request concerns "widespread and exceptional media interest . . . in which there exist possible questions about the government's integrity which affect public confidence." JA 105. Having made this concession at the outset, DOJ cannot legitimately maintain there is no public interest in the information CREW seeks.

Yet the district court refused to credit this concession, which it characterized as made under a "quite distinct" standard from the public interest standard embodied in Exemption 7(C). 870 F. Supp. 2d at 81 n.14. It is difficult to imagine how "media interest" does not reflect "public interest" within the meaning of the FOIA. Notably, the requirement for expedited processing set forth in DOJ's regulation is, if anything, more stringent than the standard embodied in Exemption 7(C). Under Exemption 7(C), as the district court acknowledged, "'[T]he only public interest relevant for purposes of Exemption 7(C) is one that focuses on the citizens' right to be informed about what their government is up to.'" *Id.* (citing *Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1282 (D.C. Cir. 1992)). By contrast, in order to qualify for expedited processing of a request to

27

DOJ, a requester must show the matter in question is of "widespread and exceptional media interest . . . in which there exist possible questions about the government's integrity which affect public confidence." 28 C.F.R. § 16.5(d)(1)(iv). By its very language, this regulation imposes a much higher standard than merely showing the requested information will tell the public what its government is up to.

DOJ, for its part, also refused to credit the information CREW presented showing how its request sought information in the public interest. Before the district court, DOJ claimed CREW must come forward with evidence of agency impropriety, citing the Supreme Court's decision in *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157 (2004). It is well established, however, that the public interest part of the balancing equation does not depend only on a showing of agency impropriety.

In *Reporters Comm.*, the Supreme Court enunciated the "factors [that] might warrant an invasion" of the privacy interest protected by Exemption 7(C). 489 U.S. at 771 (emphasis in original). The Court made clear that only where a requester "intend[s] to discover anything about the conduct of the agency" will a request justify disclosure. *Id.* at 773. This requirement flows from the fundamental purpose of the FOIA: "'to open agency action to the light of public

28

scrutiny.'"  *Id.* at 772 (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976)).

Twenty-five years later in *Favish*, the Supreme Court again examined the nature of the public interest that warrants disclosure over a privacy claim.  As in *Reporters Comm.*, the touchstone for the Court's analysis was the FOIA's purpose of providing "a means for citizens to know 'what the Government is up to.'"  541 U.S. 171 (quoting *Reporters Comm.*, 489 U.S. at 749).  In the context of Exemption 7(C) the Court held disclosure was warranted where a requester could satisfy two requirements:

> show[ing] that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake . . . [and] the information is likely to advance that interest.

*Id.* at 172.

The requester in *Favish* was seeking autopsy photographs of Vincent Foster's body to support his view that the government's multiple investigations of this matter "were 'grossly incomplete and untrustworthy.'"  541 U.S. at 161 (citation omitted).  The Supreme Court concluded that where a requester is alleging government officials "acted negligently or otherwise improperly in the performance of their duties," the requester had to come forward with more than "a bare suspicion."  Instead, the requester had to "produce evidence that would

29

warrant a belief by a reasonable person that the alleged Government impropriety

might have occurred." *Id.* at 174.

The Court was careful to stress, however, the limits of its ruling, which

applies only where a requester is alleging government impropriety.  In other cases,

> the balancing exercise . . . might require us to make a
> somewhat more precise determination regarding the
> significance of the public interest and the historical
> importance of the events in question.  We might need to
> consider the nexus required between the requested
> documents and the purported public interest served by
> disclosure.

*Id.* at 175.

The instant case falls outside the scope of *Favish*, as CREW is not alleging

government impropriety.  *See*, *e.g.*, *Showing Animals Respect & Kindness*, 730 F.

Supp. 2d at 195 n.17 (*Favish* standard does not apply where the plaintiff "does not

argue that there was any negligence or misfeasance on the part of government

officials.").[11]  *See also CREW v. U.S. Dep't of Justice*, 846 F. Supp. 2d 63, 74

(D.D.C. 2012) (where CREW was not "justify[ing] its request on the ground of

agency misconduct . . . it need not produce the compelling evidence of illegal

activity that would be required if it had done so.") (citation omitted); *CREW v.

U.S. Dep't of Justice*, 840 F. Supp. 2d. at 235 (same).  Rather, CREW seeks to

---

[11] Moreover, *Favish* did not involve an agency's assertion of a categorical
exemption.

shed light on DOJ's activities, specifically why it declined to prosecute Mr. DeLay

notwithstanding the significant public record suggesting serious violations of

federal laws.  Thus, CREW seeks information bearing directly on DOJ's

performance of its statutory duties, an interest well within those recognized under

Exemption 7(C) as sufficient to overcome asserted privacy interests.

Post-*Favish* authority from this Court confirms the public interest in

information like that CREW seeks here, outside of the context of an allegation of

government wrongdoing.  In *ACLU v. DOJ*, this Court reaffirmed the holding of

*Reporters Comm.* to conclude that where, as here, a FOIA requester is "not (or at

least not only) seeking to show that the government's [action] is legally improper,"

evidence of misconduct is not required.  "'[M]atters of substantive law

enforcement policy . . . are properly the subject of public concern,' whether or not

the policy in question is lawful."  655 F.3d at 38 (quoting *Reporters Comm.*, 489

U.S. at 766 n.18).

In sum, the record here establishes that DOJ's investigation of Mr. DeLay

already is a matter of public knowledge that Mr. DeLay himself touted publicly.

Numerous details about DOJ's public corruption investigation already have been

disclosed through DOJ's own press releases and testimony in open court

proceedings.  As such, there is no cognizable privacy interest identified by DOJ

that would be harmed by disclosing information associating Mr. DeLay with the

investigation.  There is, however, a demonstrated and substantial public interest in

the disclosure of the requested material that would "shed light" on the manner in

which DOJ conducted a high-profile public corruption investigation.  Accordingly,

the balance of interests weighs entirely on the side of disclosure.  DOJ's attempt to

withhold all responsive information on a "categorical" basis must therefore fail,

and the agency must be required to submit the particularized showing required by

*Vaughn* so that the district court can evaluate whether any of the requested material

is properly protected from disclosure by Exemptions 6 and 7(C).

## II.    DOJ'S CATEGORICAL WITHHOLDING OF ALL RESPONSIVE DOCUMENTS UNDER FOIA EXEMPTION 7(A) TO PREVENT INTERFERENCE WITH A CRIMINAL INVESTIGATION IS UNLAWFUL.

The district court further erred in holding that DOJ "properly withheld the

records *in whole* pursuant to Exemption 7(A)," which protects from disclosure law

enforcement records to the extent that release "could reasonably be expected to

interfere with enforcement proceedings."  870 F. Supp. 2d at 82 (emphasis added),

(quoting 5 U.S.C. § 552(b)(7)(A)).  As with its flawed handling of DOJ's

"categorical" claim of exemption on privacy grounds, the court failed to take into

account the particular circumstances present here that render reliance upon a

categorical "interference" claim inappropriate.

Endorsing DOJ's categorical invocation of Exemption 7(A) to withhold all records responsive to CREW's FOIA request, the district court quoted this Court's observation in *Maydak v. U.S. Dep't of Justice*, 218 F.3d 760 (D.C. Cir. 2000), that "DOJ satisfies its burden of proof under Exemption 7(A) by grouping documents in categories and offering generic reasons for withholding the documents in each category." 870 F. Supp. 2d at 82 (quoting *Maydak*, 218 F.3d at 765).[12]  The *Maydak* language derived from *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 236 (1978), where the Supreme Court noted, "Congress did not intend to prevent the federal courts from determining that, with respect to particular kinds of enforcement proceedings, disclosure of particular kinds of investigatory records while a case is pending would generally 'interfere with enforcement proceedings.'"

The issue in *Robbins Tire* was whether the FOIA "requires the National Labor Relations Board to disclose, prior to its hearing on an unfair labor practice complaint, statements of witnesses whom the Board intends to call at the hearing." *Id*. at 216.  The Court emphasized it was "dealing here with the *narrow question* of whether witnesses' statements must be released five days prior to an unfair labor practice hearing," and concluded, "we cannot see how FOIA's purposes would be

---

[12]  It should be noted Exemption 7(A) was not at issue in *Maydak*, as the agency "had abandoned its reliance on" the exemption while the case was pending.  218 F.3d at 764.

defeated by deferring disclosure until after the Government has 'presented its case in court.'"  *Id*. at 242 (emphasis added; citation omitted).

The circumstances here are a far cry from those present in *Robbins Tire.*  In this case, DOJ seeks to withhold *all* witness statements and "investigation reports" collected during the course of what it describes as a "wide-ranging criminal investigation of Jack Abramoff and numerous other associates and individuals for illegal campaign contributions and violations of election laws," JA 32, ¶ 25.  Moreover, DOJ's investigation resulted in several public proceedings, numerous DOJ press releases, and the public identification of a host of individuals involved in the matter.  Nevertheless DOJ has claimed, in a generic fashion, harm would result from the disclosure of, *inter alia*, the names of "witnesses and other third parties" and "information, leads and other valuable investigative information supplied by various sources."  JA 36-37, ¶ 35.  In light of the fact that here, unlike in *Robbins Tire*, the agency already has "presented its case in court" on several occasions, with the resulting public testimony of numerous witnesses, *see* JA 166-168, the circumstances of this case are particularly ill-suited for a "generic" claim that the disclosure of *any* witness information would harm an investigative interest.

This Court has long recognized the protections of Exemption 7(A) do not properly extend globally to situations in which "parts" of a proceeding or investigation have been concluded.  Thus, in *North v. Walsh*, 881 F.2d 1088 (D.C.

34

Cir. 1989) – cited by the district court in support of its decision here, 870 F. Supp. 2d at 83 – the Court considered the applicability of the exemption to records developed during the Independent Counsel's criminal investigation of Oliver North's involvement in the Iran-Contra affair. The Court made clear the protection of Exemption 7(A) necessarily is limited where, as here, the underlying investigation has already resulted in proceedings that have been concluded. As the Court reasoned, "[d]isclosure of the information North seeks *cannot interfere with parts of the enforcement proceeding already concluded*." 881 F.2d at 1100 (emphasis added). Accordingly, the Court directed the district court, on remand to "consider *whether disclosure can reasonably be expected to interfere in a palpable, particular way with the remaining portions of the enforcement proceedings . . . .*" *Id*.

Likewise here, the conclusion of several high-profile, public proceedings growing out of DOJ's political corruption investigation required the district court to "consider whether disclosure can reasonably be expected to interfere in a palpable, particular way" with any further proceedings. *Id.* Instead, the district court merely rubber-stamped DOJ's "categorical" refusal to disclose *any* information, without even the benefit of a *Vaughn* index describing the withheld material.

As this Court has held, "[t]here are limits . . . to when categorical rules may be employed.  Only when the range of circumstances included in the category 'characteristically supports an inference' that the statutory requirements for exemption are satisfied is such a rule appropriate." *Nation Magazine*, 71 F.3d at 893 (quoting *United States v. Landano*, 508 U.S. 165, 177 (1993)); *see also Long v. U.S. Dep't of Justice*, 450 F. Supp. 2d 42, 76 (D.D.C. 2006) (rejecting categorical invocation of Exemption 7(A) where "the range of circumstances . . . do not 'characteristically support' an inference that disclosure of this information would interfere with law enforcement proceedings").

In this case, the "range of circumstances" includes the strong possibility that many of the withheld records contain the names of, and information derived from, individuals who testified publicly at trial or whose involvement in the "broad, widespread investigation into illegal lobbying activities" is already a matter of public record.  The FBI's declarant, in describing the alleged harm that might result from disclosure of the withheld material, asserted "[o]nce documents are released and are in the public domain, information concerning the investigation could reach the very individuals who remain under investigation." JA 35, ¶ 31.  He does not, however, assert that none of the information at issue previously has been disclosed in press releases or trial testimony, nor could he.

36

This Court has noted where a FOIA request reaches "information to which a potential target apparently has access," as is clearly possible here, the court "must conduct a more focused and particularized review of the documentation on which the government bases its claim that the information [requested] would interfere with the investigation." *Campbell v. Dep't of Health & Human Servs.*, 682 F.2d 256, 265 (D.C. Cir. 1982). *See also Gray v. U.S. Army Crim. Investigation Command*, 742 F. Supp. 2d 68, 75 (D.D.C. 2010) (rejecting invocation of Exemption 7(A) where agency claims "appear designed to cover every scenario in which a plaintiff seeks the disclosure of records related to a law enforcement proceeding").  DOJ's position in this case, where it seeks to "categorically" withhold *all* responsive material on the ground that disclosure "could *reasonably be expected* to interfere with enforcement proceedings," 5 U.S.C. § 552(b)(7)(A) (emphasis added), must fail given the public availability of a substantial amount of information related to the agency's corruption investigation.

In the absence of a *Vaughn* index specifically describing the material DOJ seeks to withhold, there was simply no foundation in the district court for "adversarial testing of [DOJ's] claims," nor the kind of specific information that would "help[] focus the court's attention on the most important issues in the litigation and [that] may reveal not otherwise apparent flaws in [DOJ's] reasoning." *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1185 (D.C. Cir. 2011).  Under the

circumstances present here, the agency's generic and categorical invocation of

Exemption 7(A) cannot be sustained.

## III.   DOJ'S CATEGORICAL WITHHOLDING OF RESPONSIVE INFORMATION UNDER FOIA EXEMPTIONS 3, 7(D), AND 7(E) IS UNLAWFUL.

In addition to upholding DOJ's attempt to "categorically" withhold all

responsive records under Exemptions 6, 7(C), and 7(A), the district court also

endorsed the agency's withholding of some unspecified amount of information on

the basis of Exemptions 3, 7(D), and 7(E).[13]  As a threshold matter, the agency has

never even attempted to quantify how many responsive records exist and, in the

absence of a *Vaughn* index, it is impossible for CREW or the Court to determine

the extent to which any specific information has been withheld under the claimed

exemptions.  As such, the posture of this case presents a classic example of the

"information asymmetry" that "distort[s] . . . the traditional adversary nature of our

legal system's form of dispute resolution" and motivated this Court to impose the

*Vaughn* index requirement in 1973.  *Campaign for Responsible Transplantation v.*

*FDA*, 511 F.3d 187, 196 (D.C. Cir. 2007); *see also Schiller v. NLRB*, 964 F.2d

---

[13] The court also upheld DOJ's invocation of Exemption 2 to withhold "secure and nonsecure internal telephone numbers and secure internal facsimile numbers of FBI personnel," 870 F. Supp. 2d at 83.  It is unclear why the court addressed the issue, as CREW did not challenge the agency's Exemption 2 claims below, and does not do so here.

1205, 1209 (D.C. Cir. 1992) ("those who contest denials of FOIA requests – who are, necessarily, at a disadvantage because they have not seen the withheld documents – can generally prevail only by showing that the agency's *Vaughn* index does not justify withholding information under the exemptions invoked") (citations omitted).

### A.     Exemption 3

Even in the face of this "disadvantage," CREW submits DOJ clearly failed to meet its burden of justifying its withholding claims.  Under Exemption 3, an agency may rely on Fed. R. Crim. P. 6(e) only to withhold specific information that would reveal "matters occurring before the grand jury," *Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856, 866 (D.C. Cir. 1981).  In upholding DOJ's unspecified withholdings, the district court quoted *In re Motions of Dow Jones & Co.* 142 F.3d 496, 500 (D.C. Cir. 1998), in support of the proposition that the protection of Rule 6(e) "includes not only what has occurred and what is occurring, but also what is likely to occur" before a grand jury.  870 F. Supp. 2d at 84.  In *Dow Jones*, however, this Court tempered that language by referencing its earlier decision in *SEC v. Dresser Industries, Inc.*, 628 F.2d 1368, 1382 (D.C. Cir. 1980) (*en banc*), where it held Rule 6(e) "does not require . . . that a veil of secrecy be drawn over all matters occurring in the world that happen to be investigated by a grand jury."  (footnote omitted).  *See* 142 F.3d at 500.  Indeed,

39

this Court has subsequently cautioned, "[d]espite the seemingly broad nature of the statements in *Dow Jones*," the coverage of Rule 6(e) is limited and the phrase "likely to occur" must be read narrowly.  *In re Sealed Case No. 99-3091*, 192 F.3d 995, 1001 (D.C. Cir. 1999); *see also Senate of Puerto Rico ex rel. Judiciary Comm. v. U.S. Dep't of Justice*, 823 F.2d 574, 582 (D.C. Cir. 1987).

In this case, DOJ did not come close to asserting information withheld under Exemption 3 would reveal "what has occurred," "what is occurring," or even "what is *likely* to occur" before a grand jury.  Rather, in the portions of the agency declaration relied upon by the district court, 870 F. Supp. 2d at 84, the declarant merely stated, without explanation or elaboration, DOJ is withholding "information contained in the FD-302s which identifies specific records that *may* be subpoenaed by a Federal Grand Jury," JA 37, ¶ 36, and "information which explicitly discloses matters that *would* occur before a Federal Grand Jury," JA 41, ¶ 47 (emphasis added).  There simply was no basis in the record for the district court to conclude disclosure of the withheld information would reveal "what is likely to occur" before a grand jury.

This Court has made plain it "require[s] some affirmative demonstration of a nexus between disclosure and revelation of a protected aspect of the grand jury's investigation" before sustaining an agency's reliance upon Rule 6(e).  *Senate of Puerto Rico*, 823 F.2d at 584 (footnote omitted).  As such, an agency must

"suppl[y] the information a court must have in order to intelligently make [the] judgment" that disputed information "cannot be disclosed without compromising the secrecy of a grand jury's deliberations." *Id.*; *see also Lopez v. U.S. Dep't of Justice*, 393 F.3d 1345, 1350 (D.C. Cir. 2005) (same). Without more than DOJ's meager assertion that disclosure of some unspecified information "would violate the secrecy of grand jury proceedings," JA 37, ¶ 36, the district court was unable to determine the agency's exemption claims were appropriate.

## B.     Exemption 7(D)

As with its invocation of Exemption 3, DOJ's reliance on Exemption 7(D) to withhold "confidential source" information was not supported by specific facts relating to the circumstances of this case. In the most generic of terms, the FBI's declarant, Mr. Hardy, referenced "[n]umerous confidential sources [that] report to the FBI on a regular basis," and made the sweeping claim that "[d]uring the course of *an* investigation" they "provide information under circumstances from which assurances of confidentiality can be inferred." JA 47, ¶ 61 (emphasis added). On this basis, the FBI considers "[t]hese individuals and organizations . . . to be confidential sources since they furnish information with the understanding that their identities and information provided will not be divulged outside the FBI." *Id.* Notably, Mr. Hardy made no specific reference to the investigation at issue here or the individuals who already have testified publicly in the several criminal

41

prosecutions that resulted from DOJ's public corruption investigation. Nor did he provide any information upon which the district court could determine whether specific records, derived from specific sources, have been properly withheld.

The FBI's claim is precisely the kind this Court in *Roth* held is insufficient to justify withholdings under Exemption 7(D). There this Court ruled, "*it is not enough for the agency to claim that all sources providing information in the course of a criminal investigation do so on a confidential basis.*" 642 F.3d at 1184 (emphasis added). In the absence of an express promise of confidentiality, the Court will look to the "'more narrowly defined circumstances that . . . support the inference' of confidentiality." *Id.* (citation omitted). These circumstances include: (1) "the character of the crime at issue"; (2) "the source's relation to the crime"; (3) "whether the source received payment"; and (4) "whether the source has an 'ongoing relationship' with the law enforcement agency and typically communicates with the agency 'only at locations and under conditions which assure the contact will not be noticed.'" *Id.* Moreover, even when the FBI is claiming "an express assurance of confidentiality," courts cannot conduct "meaningful judicial review" without "sufficient evidence that such an assurance was in fact given." *Id. See also Hodge v. FBI*, 703 F.3d 575, 581 (D.C. Cir. 2013); *Billington v. U.S. Dep't of Justice*, 233 F.3d 581, 584-586 (D.C. Cir. 2000); *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 34 (D.C. Cir. 1998).

42

While the district court here purported to consider the factors identified in *Roth*, *see* 870 F. Supp. 2d at 85, it clearly lacked the kind of detailed, specific information required to make a finding of confidentiality. DOJ's showing was entirely generic, with no reference to the specific circumstances present in this case. The agency's declarant merely asserted "[n]umerous confidential sources report to the FBI on a regular basis and are 'informants' within the common definition of the term," and "individuals and organizations provide information under circumstances from which assurances of confidentiality can be inferred." JA 47, ¶ 61. These statements are at such a level of generality as to provide no useful basis for a court to conclude the withheld information falls within Exemption 7(D).

Indeed, the generic information relied upon by the district court stands in stark contrast to the specific and detailed showing the Court had before it in *Roth*. There, the FBI identified four specific categories of confidential sources:

> law enforcement agencies; informants who have been
> assigned confidential source symbol numbers; third
> parties without source symbol numbers who nonetheless
> provided information under an express assurance of
> confidentiality; and third parties who provided
> information under an implied assurance of confidentiality.

642 F.3d at 1185. The Court reviewed the withheld documents *in camera* and the agency provided detailed *Vaughn* indices that allowed the Court to understand and describe in detail the circumstances surrounding the disputed material.

43

Specifically, the agency's *Vaughn* indices described how the documents were labeled, stated the sources had "specifically requested their identities not be disclosed because they feared reprisal," and explained how the withheld documents "contain positive indications that the FBI gave the sources express assurances of confidentiality." *Id.* at 1186. According to the FBI, "one source 'desired to remain anonymous,'" and the records concerning a second source contained the notation 'protect identity.'" *Id.* (citations omitted). One source discussed in the files was described as having "'provided information to the FBI for a number of years as a confidential informant with an express promise of confidentiality.'" *Id.* Another, according to the FBI's *Vaughn* index, "'provided specific detailed information that is singular in nature concerning the criminal activities involving [the subject], his associates, and/or other subjects of [the FBI's] investigation.'" 642 F.2d at 1185 (citation omitted).

The circumstances in *Roth* also underscore the district court's error in concluding "it is reasonable to assume that sources provided information with an understanding that their communications would remain confidential." 870 F. Supp. 2d at 85 (citation and internal quotation marks omitted). In making that assumption, the district court cited "the nature of the crimes involved in the investigation – high profile political corruption charges of conspiracy, fraud, and tax evasion." *Id.* In *Roth*, by contrast, the Court "conclude[d] that given the brutal

44

nature of the quadruple homicide and the source's relationship with at least some of the victims, the source likely provided information to the FBI 'with an understanding that the communication would remain confidential.'"  642 F.3d at 1186 (citation omitted).  Indeed, implied expectations of confidentiality are often found where – unlike here – the criminal activity under investigation involves extreme violence.  *See*, *e.g.*, *Landano*, 508 U.S. at 179 ("Most people would think that witnesses to a gang-related murder likely would be unwilling to speak to the Bureau except on the condition of confidentiality," so confidentiality may be implied); *Mays v. DEA*, 234 F.3d 1324, 1330-1331 (D.C. Cir. 2000) ("an informant is at risk to the extent the criminal enterprise he exposes is of a type inclined toward violent retaliation . . . [and the threat of such retaliation] is enough to establish the inference of implied confidentiality for those who give information about such a conspiracy").  The white-collar corruption investigation at issue here is a far cry from the types of cases in which assurances of confidentiality may be implied.  Accordingly, the district court clearly erred in its endorsement of DOJ's generic and unsupported claims under Exemption 7(D).

## C.    Exemption 7(E)

Finally, the district court erred when it found DOJ properly invoked Exemption 7(E) to protect investigation techniques and procedures.  In support of its claim, DOJ once again failed to provide any specific information that would

have permitted the court to assess the propriety of any such withholdings, instead simply reciting the general standards governing invocation of the exemption.  *See* JA 48, ¶¶ 63-64.  Such an approach falls far short of the kind of showing this Court requires.

Exemption 7(E) "requires that the [agency] demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011), quoting *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1194 (D.C. Cir. 2009).  Such a showing necessarily requires a court to know *something* about the information being withheld.  Thus, in *Blackwell*, the FBI withheld "'details about procedures used during the forensic examination of a computer' by an FBI forensic examiner."  In support of its withholdings, the agency relied on a declarant who explained "release of specifics of these investigative techniques would risk circumvention of the law by individuals who seek to utilize computers in violation of laws," and "[b]y releasing that information, the FBI would be exposing computer forensic vulnerabilities to potential criminals."  646 F.3d at 42 (citation and internal quotation marks omitted).  The FBI also invoked Exemption 7(E) to protect "methods of data collection, organization and presentation contained in ChoicePoint reports."  Again, the agency relied on details provided by its declarant, specifically that "the manner in which the data is searched, organized and reported to the FBI is an

46

internal technique, not known to the public," and the "method was developed by ChoicePoint to meet the specific investigative needs of the FBI." *Id*.  According to the FBI declarant, disclosure of the requested information "could enable criminals to employ countermeasures to avoid detection, thus jeopardizing the FBI's investigatory missions." *Id*. (citation and internal quotation marks omitted).  Upon consideration of this detailed explanation, the Court found the agency had "logically explain[ed] how the data could help criminals circumvent the law." *Id*. (citation omitted); *see also Mayer Brown LLP* (detailed analysis of Exemption 7(E) claim).

This detail is completely missing here.  In the absence of a *Vaughn* index, or any other information sufficient for the district court to decide whether the information at issue here was properly withheld under Exemption 7(E), the court clearly erred in sustaining DOJ's unsupported invocation of Exemption 7(E).

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court and remand this case for further consideration of any exemption claims asserted by DOJ based on a full factual record, including a specific identification of each document or document portion for which an exemption is claimed, and the specific justification for each withholding.

/s/ Anne L. Weismann
*Anne L. Weismann
Melanie T. Sloan
CITIZENS FOR RESPONSIBILITY AND
    ETHICS IN WASHINGTON
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20005
(202) 408-5565

David Sobel
LAW OFFICE OF DAVID L. SOBEL
1818 N Street, N.W., Suite 410
Washington, D.C.  20036
(202) 246-6180

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*11,060*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Corel WordPerfect 12*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>April 1, 2012</u>           <u>/s/ Anne L. Weismann</u>
                                      *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 1st day of April, 2013, I caused this Brief of

Appellant and Joint Appendix to be filed electronically with the Clerk of the Court

using the CM/ECF System, which will send notice of such filing to the following

registered CM/ECF users:

> Steve Frank
> Leonard Schaitman
> U.S. DEPARTMENT OF JUSTICE
> 950 Pennsylvania Avenue, N.W.
> Washington D.C.  20530
> (202) 514-4820
>
> *Counsel for Appellee*

I further certify that on this 1st day of March, 2013, I caused the required

copies of the Brief of Appellant and Joint Appendix to be hand filed with the Clerk

of the Court and a copy of the Joint Appendix to be served, via UPS Ground

Transportation, to the Counsel of Appellee at the above address.

/s/ Anne L. Weismann    
*Counsel for Appellant*

# ADDENDUM

# TABLE OF CONTENTS

**Page**

5 U.S.C. § 522 .................................................................................................... Add. 1

5 U.S.C. § 552:  Freedom of Information Act

(a) Each agency shall make available to the public information as follows:

(1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

(A) descriptions of its central and field organization and the established places at which, the employees (and in the case of a uniformed service, the members) from whom, and the methods whereby, the public may obtain information, make submittals or requests, or obtain decisions;

(B) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and informal procedures available;

(C) rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and contents of all papers, reports, or examinations;

(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and

(E) each amendment, revision, or repeal of the foregoing. Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published. For the purpose of this paragraph, matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register.

(2) Each agency, in accordance with published rules, shall make available for public inspection and copying—

(A) final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases;

(B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register;

(C) administrative staff manuals and instructions to staff that affect a member of the public;

(D) copies of all records, regardless of form or format, which have been released to any person under paragraph (3) and which, because of the nature of their subject matter, the agency determines have become or are likely to become the subject of subsequent requests for substantially the same records; and

(E) a general index of the records referred to under subparagraph (D); unless the materials are promptly published and copies offered for sale. For records created on or after November 1, 1996, within one year after such date, each agency shall make such records available, including by computer telecommunications or, if computer telecommunications means have not been established by the agency, by other electronic means. To the extent required to prevent a clearly unwarranted invasion of personal privacy, an agency may delete identifying details when it makes available or publishes an opinion, statement of policy, interpretation, staff manual, instruction, or copies of records referred to in subparagraph (D). However, in each case the justification for the deletion shall be explained fully in writing, and the extent of such deletion shall be indicated on the portion of the record which is made available or published, unless including that indication would harm an interest protected by the exemption in subsection (b) under which the deletion is made. If technically feasible, the extent of the deletion shall be indicated at the place in the record where the deletion was made. Each agency shall also maintain and make available for public inspection and copying current indexes providing identifying information for the public as to any matter issued, adopted, or promulgated after July 4, 1967, and required by this paragraph to be made available or published. Each agency shall promptly publish, quarterly or more frequently, and distribute (by sale or otherwise) copies of each index or supplements thereto unless it determines by order published in the Federal Register that the publication would be unnecessary and impracticable, in which case the agency shall nonetheless provide copies of such index on request at a cost not to exceed the direct cost of duplication. Each agency shall

make the index referred to in subparagraph (E) available by computer telecommunications by December 31, 1999. A final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a member of the public may be relied on, used, or cited as precedent by an agency against a party other than an agency only if—

(i) it has been indexed and either made available or published as provided by this paragraph; or

(ii) the party has actual and timely notice of the terms thereof.

(3)

(A) Except with respect to the records made available under paragraphs (1) and (2) of this subsection, and except as provided in subparagraph (E), each agency, upon any request for records which

(i) reasonably describes such records and

(ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person.

(B) In making any record available to a person under this paragraph, an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format. Each agency shall make reasonable efforts to maintain its records in forms or formats that are reproducible for purposes of this section.

(C) In responding under this paragraph to a request for records, an agency shall make reasonable efforts to search for the records in electronic form or format, except when such efforts would significantly interfere with the operation of the agency's automated information system.

(D) For purposes of this paragraph, the term "search" means to review, manually or by automated means, agency records for the purpose of locating those records which are responsive to a request.

Add. 3

(E) An agency, or part of an agency, that is an element of the intelligence community (as that term is defined in section 3(4) of the National Security Act of 1947 (50 U.S.C. 401a (4))) shall not make any record available under this paragraph to—

> (i) any government entity, other than a State, territory, commonwealth, or district of the United States, or any subdivision thereof; or

> (ii) a representative of a government entity described in clause (i).

(4)

> (A)

>> (i) In order to carry out the provisions of this section, each agency shall promulgate regulations, pursuant to notice and receipt of public comment, specifying the schedule of fees applicable to the processing of requests under this section and establishing procedures and guidelines for determining when such fees should be waived or reduced. Such schedule shall conform to the guidelines which shall be promulgated, pursuant to notice and receipt of public comment, by the Director of the Office of Management and Budget and which shall provide for a uniform schedule of fees for all agencies.

>> (ii) Such agency regulations shall provide that—

>>> (I) fees shall be limited to reasonable standard charges for document search, duplication, and review, when records are requested for commercial use;

>>> (II) fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by an educational or noncommercial scientific institution, whose purpose is scholarly or scientific research; or a representative of the news media; and

(III) for any request not described in (I) or (II), fees shall be limited to reasonable standard charges for document search and duplication. In this clause, the term "a representative of the news media" means any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience. In this clause, the term "news" means information that is about current events or that would be of current interest to the public. Examples of news-media entities are television or radio stations broadcasting to the public at large and publishers of periodicals (but only if such entities qualify as disseminators of "news") who make their products available for purchase by or subscription by or free distribution to the general public. These examples are not all-inclusive. Moreover, as methods of news delivery evolve (for example, the adoption of the electronic dissemination of newspapers through telecommunications services), such alternative media shall be considered to be news-media entities. A freelance journalist shall be regarded as working for a news-media entity if the journalist can demonstrate a solid basis for expecting publication through that entity, whether or not the journalist is actually employed by the entity. A publication contract would present a solid basis for such an expectation; the Government may also consider the past publication record of the requester in making such a determination.

(iii) Documents shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.

(iv) Fee schedules shall provide for the recovery of only the direct costs of search, duplication, or review. Review costs shall include only the direct costs incurred during the initial

examination of a document for the purposes of determining whether the documents must be disclosed under this section and for the purposes of withholding any portions exempt from disclosure under this section. Review costs may not include any costs incurred in resolving issues of law or policy that may be raised in the course of processing a request under this section. No fee may be charged by any agency under this section—

> (I) if the costs of routine collection and processing of the fee are likely to equal or exceed the amount of the fee; or

> (II) for any request described in clause (ii) (II) or (III) of this subparagraph for the first two hours of search time or for the first one hundred pages of duplication.

(v) No agency may require advance payment of any fee unless the requester has previously failed to pay fees in a timely fashion, or the agency has determined that the fee will exceed $250.

(vi) Nothing in this subparagraph shall supersede fees chargeable under a statute specifically providing for setting the level of fees for particular types of records.

(vii) In any action by a requester regarding the waiver of fees under this section, the court shall determine the matter de novo: Provided, That the court's review of the matter shall be limited to the record before the agency.

(viii) An agency shall not assess search fees (or in the case of a requester described under clause (ii)(II), duplication fees) under this subparagraph if the agency fails to comply with any time limit under paragraph (6), if no unusual or exceptional circumstances (as those terms are defined for purposes of paragraphs (6)(B) and (C), respectively) apply to the processing of the request.

(B) On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding

Add. 6

agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action. In addition to any other matters to which a court accords substantial weight, a court shall accord substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility under paragraph (2)(C) and subsection (b) and reproducibility under paragraph (3)(B).

(C) Notwithstanding any other provision of law, the defendant shall serve an answer or otherwise plead to any complaint made under this subsection within thirty days after service upon the defendant of the pleading in which such complaint is made, unless the court otherwise directs for good cause shown.

[(D) Repealed. Pub. L. 98–620, title IV, § 402(2),Nov. 8, 1984, 98 Stat. 3357.]

(E)

> (i) The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed.

> (ii) For purposes of this subparagraph, a complainant has substantially prevailed if the complainant has obtained relief through either—

>> (I) a judicial order, or an enforceable written agreement or consent decree; or

>> (II) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial.

(F)

(i) Whenever the court orders the production of any agency records improperly withheld from the complainant and assesses against the United States reasonable attorney fees and other litigation costs, and the court additionally issues a written finding that the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously with respect to the withholding, the Special Counsel shall promptly initiate a proceeding to determine whether disciplinary action is warranted against the officer or employee who was primarily responsible for the withholding. The Special Counsel, after investigation and consideration of the evidence submitted, shall submit his findings and recommendations to the administrative authority of the agency concerned and shall send copies of the findings and recommendations to the officer or employee or his representative. The administrative authority shall take the corrective action that the Special Counsel recommends.

(ii) The Attorney General shall—

(I) notify the Special Counsel of each civil action described under the first sentence of clause (i); and

(II) annually submit a report to Congress on the number of such civil actions in the preceding year.

(iii) The Special Counsel shall annually submit a report to Congress on the actions taken by the Special Counsel under clause (i).

(G) In the event of noncompliance with the order of the court, the district court may punish for contempt the responsible employee, and in the case of a uniformed service, the responsible member.

(5) Each agency having more than one member shall maintain and make available for public inspection a record of the final votes of each member in every agency proceeding.

(6)

    (A) Each agency, upon any request for records made under paragraph (1), (2), or (3) of this subsection, shall—

        (i) determine within 20 days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of such determination and the reasons therefor, and of the right of such person to appeal to the head of the agency any adverse determination; and

        (ii) make a determination with respect to any appeal within twenty days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of such appeal. If on appeal the denial of the request for records is in whole or in part upheld, the agency shall notify the person making such request of the provisions for judicial review of that determination under paragraph (4) of this subsection. The 20-day period under clause (i) shall commence on the date on which the request is first received by the appropriate component of the agency, but in any event not later than ten days after the request is first received by any component of the agency that is designated in the agency's regulations under this section to receive requests under this section. The 20-day period shall not be tolled by the agency except—

            (I) that the agency may make one request to the requester for information and toll the 20-day period while it is awaiting such information that it has reasonably requested from the requester under this section; or

            (II) if necessary to clarify with the requester issues regarding fee assessment. In either case, the agency's receipt of the requester's response to the agency's request for information or clarification ends the tolling period.

    (B)

        (i) In unusual circumstances as specified in this subparagraph, the time limits prescribed in either clause (i) or clause (ii) of

subparagraph (A) may be extended by written notice to the person making such request setting forth the unusual circumstances for such extension and the date on which a determination is expected to be dispatched. No such notice shall specify a date that would result in an extension for more than ten working days, except as provided in clause (ii) of this subparagraph.

(ii) With respect to a request for which a written notice under clause (i) extends the time limits prescribed under clause (i) of subparagraph (A), the agency shall notify the person making the request if the request cannot be processed within the time limit specified in that clause and shall provide the person an opportunity to limit the scope of the request so that it may be processed within that time limit or an opportunity to arrange with the agency an alternative time frame for processing the request or a modified request. To aid the requester, each agency shall make available its FOIA Public Liaison, who shall assist in the resolution of any disputes between the requester and the agency. Refusal by the person to reasonably modify the request or arrange such an alternative time frame shall be considered as a factor in determining whether exceptional circumstances exist for purposes of subparagraph (C).

(iii) As used in this subparagraph, "unusual circumstances" means, but only to the extent reasonably necessary to the proper processing of the particular requests—

> (I) the need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request;

> (II) the need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request; or

> (III) the need for consultation, which shall be conducted with all practicable speed, with another agency having a substantial interest in the determination of the request or

among two or more components of the agency having substantial subject-matter interest therein.

(iv) Each agency may promulgate regulations, pursuant to notice and receipt of public comment, providing for the aggregation of certain requests by the same requestor, or by a group of requestors acting in concert, if the agency reasonably believes that such requests actually constitute a single request, which would otherwise satisfy the unusual circumstances specified in this subparagraph, and the requests involve clearly related matters. Multiple requests involving unrelated matters shall not be aggregated.

(C)

(i) Any person making a request to any agency for records under paragraph (1), (2), or (3) of this subsection shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of this paragraph. If the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request, the court may retain jurisdiction and allow the agency additional time to complete its review of the records. Upon any determination by an agency to comply with a request for records, the records shall be made promptly available to such person making such request. Any notification of denial of any request for records under this subsection shall set forth the names and titles or positions of each person responsible for the denial of such request.

(ii) For purposes of this subparagraph, the term "exceptional circumstances" does not include a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests.

(iii) Refusal by a person to reasonably modify the scope of a request or arrange an alternative time frame for processing a request (or a modified request) under clause (ii) after being

given an opportunity to do so by the agency to whom the person made the request shall be considered as a factor in determining whether exceptional circumstances exist for purposes of this subparagraph.

(D)

(i) Each agency may promulgate regulations, pursuant to notice and receipt of public comment, providing for multitrack processing of requests for records based on the amount of work or time (or both) involved in processing requests.

(ii) Regulations under this subparagraph may provide a person making a request that does not qualify for the fastest multitrack processing an opportunity to limit the scope of the request in order to qualify for faster processing.

(iii) This subparagraph shall not be considered to affect the requirement under subparagraph (C) to exercise due diligence.

(E)

(i) Each agency shall promulgate regulations, pursuant to notice and receipt of public comment, providing for expedited processing of requests for records—

(I) in cases in which the person requesting the records demonstrates a compelling need; and

(II) in other cases determined by the agency.

(ii) Notwithstanding clause (i), regulations under this subparagraph must ensure—

(I) that a determination of whether to provide expedited processing shall be made, and notice of the determination shall be provided to the person making the request, within 10 days after the date of the request; and

(II) expeditious consideration of administrative appeals of such determinations of whether to provide expedited processing.

(iii) An agency shall process as soon as practicable any request for records to which the agency has granted expedited processing under this subparagraph. Agency action to deny or affirm denial of a request for expedited processing pursuant to this subparagraph, and failure by an agency to respond in a timely manner to such a request shall be subject to judicial review under paragraph (4), except that the judicial review shall be based on the record before the agency at the time of the determination.

(iv) A district court of the United States shall not have jurisdiction to review an agency denial of expedited processing of a request for records after the agency has provided a complete response to the request.

(v) For purposes of this subparagraph, the term "compelling need" means—

(I) that a failure to obtain requested records on an expedited basis under this paragraph could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or

(II) with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity.

(vi) A demonstration of a compelling need by a person making a request for expedited processing shall be made by a statement certified by such person to be true and correct to the best of such person's knowledge and belief.

(F) In denying a request for records, in whole or in part, an agency shall make a reasonable effort to estimate the volume of any requested matter the provision of which is denied, and shall provide any such estimate to the person making the request, unless providing such

estimate would harm an interest protected by the exemption in subsection (b) pursuant to which the denial is made.

(7) Each agency shall—

(A) establish a system to assign an individualized tracking number for each request received that will take longer than ten days to process and provide to each person making a request the tracking number assigned to the request; and

(B) establish a telephone line or Internet service that provides information about the status of a request to the person making the request using the assigned tracking number, including—

(i) the date on which the agency originally received the request; and

(ii) an estimated date on which the agency will complete action on the request.

(b) This section does not apply to matters that are—

(1)

(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and

(B) are in fact properly classified pursuant to such Executive order;

(2) related solely to the internal personnel rules and practices of an agency;

(3) specifically exempted from disclosure by statute (other than section 552b of this title), if that statute—

(A)

(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

(ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and

Add. 14

(B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information

(A) could reasonably be expected to interfere with enforcement proceedings,

(B) would deprive a person of a right to a fair trial or an impartial adjudication,

(C) could reasonably be expected to constitute an unwarranted invasion of personal privacy,

(D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source,

(E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or

(F) could reasonably be expected to endanger the life or physical safety of any individual;

(8) contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(9) geological and geophysical information and data, including maps, concerning wells. Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection. The amount of information deleted, and the exemption under which the deletion is made, shall be indicated on the released portion of the record, unless including that indication would harm an interest protected by the exemption in this subsection under which the deletion is made. If technically feasible, the amount of the information deleted, and the exemption under which the deletion is made, shall be indicated at the place in the record where such deletion is made.

(c)

(1) Whenever a request is made which involves access to records described in subsection (b)(7)(A) and—

(A) the investigation or proceeding involves a possible violation of criminal law; and

(B) there is reason to believe that

(i) the subject of the investigation or proceeding is not aware of its pendency, and

(ii) disclosure of the existence of the records could reasonably be expected to interfere with enforcement proceedings, the agency may, during only such time as that circumstance continues, treat the records as not subject to the requirements of this section.

(2) Whenever informant records maintained by a criminal law enforcement agency under an informant's name or personal identifier are requested by a third party according to the informant's name or personal identifier, the agency may treat the records as not subject to the requirements of this

Add. 16

section unless the informant's status as an informant has been officially confirmed.

(3) Whenever a request is made which involves access to records maintained by the Federal Bureau of Investigation pertaining to foreign intelligence or counterintelligence, or international terrorism, and the existence of the records is classified information as provided in subsection (b)(1), the Bureau may, as long as the existence of the records remains classified information, treat the records as not subject to the requirements of this section.

(d) This section does not authorize withholding of information or limit the availability of records to the public, except as specifically stated in this section. This section is not authority to withhold information from Congress.

(e)

(1) On or before February 1 of each year, each agency shall submit to the Attorney General of the United States a report which shall cover the preceding fiscal year and which shall include—

(A) the number of determinations made by the agency not to comply with requests for records made to such agency under subsection (a) and the reasons for each such determination;

(B)

(i) the number of appeals made by persons under subsection (a)(6), the result of such appeals, and the reason for the action upon each appeal that results in a denial of information; and

(ii) a complete list of all statutes that the agency relies upon to authorize the agency to withhold information under subsection (b)(3), the number of occasions on which each statute was relied upon, a description of whether a court has upheld the decision of the agency to withhold information under each such statute, and a concise description of the scope of any information withheld;

(C) the number of requests for records pending before the agency as of September 30 of the preceding year, and the median and average

number of days that such requests had been pending before the agency as of that date;

(D) the number of requests for records received by the agency and the number of requests which the agency processed;

(E) the median number of days taken by the agency to process different types of requests, based on the date on which the requests were received by the agency;

(F) the average number of days for the agency to respond to a request beginning on the date on which the request was received by the agency, the median number of days for the agency to respond to such requests, and the range in number of days for the agency to respond to such requests;

(G) based on the number of business days that have elapsed since each request was originally received by the agency—

(i) the number of requests for records to which the agency has responded with a determination within a period up to and including 20 days, and in 20-day increments up to and including 200 days;

(ii) the number of requests for records to which the agency has responded with a determination within a period greater than 200 days and less than 301 days;

(iii) the number of requests for records to which the agency has responded with a determination within a period greater than 300 days and less than 401 days; and

(iv) the number of requests for records to which the agency has responded with a determination within a period greater than 400 days;

(H) the average number of days for the agency to provide the granted information beginning on the date on which the request was originally filed, the median number of days for the agency to provide the granted information, and the range in number of days for the agency to provide the granted information;

Add. 18

(I) the median and average number of days for the agency to respond to administrative appeals based on the date on which the appeals originally were received by the agency, the highest number of business days taken by the agency to respond to an administrative appeal, and the lowest number of business days taken by the agency to respond to an administrative appeal;

(J) data on the 10 active requests with the earliest filing dates pending at each agency, including the amount of time that has elapsed since each request was originally received by the agency;

(K) data on the 10 active administrative appeals with the earliest filing dates pending before the agency as of September 30 of the preceding year, including the number of business days that have elapsed since the requests were originally received by the agency;

(L) the number of expedited review requests that are granted and denied, the average and median number of days for adjudicating expedited review requests, and the number adjudicated within the required 10 days;

(M) the number of fee waiver requests that are granted and denied, and the average and median number of days for adjudicating fee waiver determinations;

(N) the total amount of fees collected by the agency for processing requests; and

(O) the number of full-time staff of the agency devoted to processing requests for records under this section, and the total amount expended by the agency for processing such requests.

(2) Information in each report submitted under paragraph (1) shall be expressed in terms of each principal component of the agency and for the agency overall.

(3) Each agency shall make each such report available to the public including by computer telecommunications, or if computer telecommunications means have not been established by the agency, by other electronic means. In addition, each agency shall make the raw

statistical data used in its reports available electronically to the public upon request.

(4) The Attorney General of the United States shall make each report which has been made available by electronic means available at a single electronic access point. The Attorney General of the United States shall notify the Chairman and ranking minority member of the Committee on Government Reform and Oversight of the House of Representatives and the Chairman and ranking minority member of the Committees on Governmental Affairs and the Judiciary of the Senate, no later than April 1 of the year in which each such report is issued, that such reports are available by electronic means.

(5) The Attorney General of the United States, in consultation with the Director of the Office of Management and Budget, shall develop reporting and performance guidelines in connection with reports required by this subsection by October 1, 1997, and may establish additional requirements for such reports as the Attorney General determines may be useful.

(6) The Attorney General of the United States shall submit an annual report on or before April 1 of each calendar year which shall include for the prior calendar year a listing of the number of cases arising under this section, the exemption involved in each case, the disposition of such case, and the cost, fees, and penalties assessed under subparagraphs (E), (F), and (G) of subsection (a)(4). Such report shall also include a description of the efforts undertaken by the Department of Justice to encourage agency compliance with this section.

(f) For purposes of this section, the term—

(1) "agency" as defined in section 551 (1) of this title includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency; and

(2) "record" and any other term used in this section in reference to information includes—

(A) any information that would be an agency record subject to the requirements of this section when maintained by an agency in any format, including an electronic format; and

(B) any information described under subparagraph (A) that is maintained for an agency by an entity under Government contract, for the purposes of records management.

(g) The head of each agency shall prepare and make publicly available upon request, reference material or a guide for requesting records or information from the agency, subject to the exemptions in subsection (b), including—

(1) an index of all major information systems of the agency;

(2) a description of major information and record locator systems maintained by the agency; and

(3) a handbook for obtaining various types and categories of public information from the agency pursuant to chapter 35 of title 44, and under this section.

(h)

(1) There is established the Office of Government Information Services within the National Archives and Records Administration.

(2) The Office of Government Information Services shall—

(A) review policies and procedures of administrative agencies under this section;

(B) review compliance with this section by administrative agencies; and

(C) recommend policy changes to Congress and the President to improve the administration of this section.

(3) The Office of Government Information Services shall offer mediation services to resolve disputes between persons making requests under this section and administrative agencies as a non-exclusive alternative to

litigation and, at the discretion of the Office, may issue advisory opinions if mediation has not resolved the dispute.

(i) The Government Accountability Office shall conduct audits of administrative agencies on the implementation of this section and issue reports detailing the results of such audits.

(j) Each agency shall designate a Chief FOIA Officer who shall be a senior official of such agency (at the Assistant Secretary or equivalent level).

(k) The Chief FOIA Officer of each agency shall, subject to the authority of the head of the agency—

> (1) have agency-wide responsibility for efficient and appropriate compliance with this section;

> (2) monitor implementation of this section throughout the agency and keep the head of the agency, the chief legal officer of the agency, and the Attorney General appropriately informed of the agency's performance in implementing this section;

> (3) recommend to the head of the agency such adjustments to agency practices, policies, personnel, and funding as may be necessary to improve its implementation of this section;

> (4) review and report to the Attorney General, through the head of the agency, at such times and in such formats as the Attorney General may direct, on the agency's performance in implementing this section;

> (5) facilitate public understanding of the purposes of the statutory exemptions of this section by including concise descriptions of the exemptions in both the agency's handbook issued under subsection (g), and the agency's annual report on this section, and by providing an overview, where appropriate, of certain general categories of agency records to which those exemptions apply; and

> (6) designate one or more FOIA Public Liaisons.

(l) FOIA Public Liaisons shall report to the agency Chief FOIA Officer and shall serve as supervisory officials to whom a requester under this section can raise concerns about the service the requester has received from the FOIA Requester

Center, following an initial response from the FOIA Requester Center Staff. FOIA Public Liaisons shall be responsible for assisting in reducing delays, increasing transparency and understanding of the status of requests, and assisting in the resolution of disputes.